Next case for argument is Kennedy v. Lilly Extended Disability, Ms. Foshcroft. Ms. Kennedy. Thank you. May it please the court. My name is Ellen Boschkoff. I represent the appellant in the Lilly Employee Benefits Plan. This is an appeal from a district court decision reversing the decision of the Lilly Employee Benefits Committee, who just determined that the appellee, Ms. Kennedy, was not entitled to continued benefits under the plan. There are two issues here on this appeal. Whether the district court misapplied the arbitrary and capricious standard of review in reversing the Employee Benefit Committee, and I'll call it the EBC, in reversing the EBC's decision. And second, whether the district court erred by ordering a reinstatement of Ms. Kennedy's benefits rather than remanding. I want to start with some important medical evidence. This really is a case about medical evidence. And going back to September of 2010, Dr. Noyks, a rheumatologist who was hired to do an independent medical exam, and who later became Ms. Kennedy's treating physician, performed a very comprehensive examination of her. Some of it is cited in Ms. Kennedy's brief. A lot of it is not. And I want to draw your attention, the court's attention, to a few comments if I could. And this is in our supplemental appendix. Physical examination reveals a well-developed, well-nourished, well-groomed female. She moved back and forth in the exam room without apparent discomfort. She was attentive and alert. More comments as to the joint examination. A variety of negative findings. DIPS negative, PIPS negative, I don't know what those acronyms were, but it goes on. With a lot of negative findings. A few findings of tenderness, that's it. As to functioning, this is what he said. The patient's function level includes her being completely confident in self-ADL. She is able to do her pre-morbid level of routine domestic chores, including cleaning and shopping. She is physically active. She runs three miles about four to five times a week. She is active in yoga exercise and does an aggressive stretching program. She is active in church. And then finally, as to functional impairment, Dr. Neuqs said, it is clear that the patient has relatively high functioning. She is able to jog three miles. She is fully capable of doing her ADL and routine social functioning. However, I think when this is compared to the high stress that she was in, there is an inability to return to that level of work. So that was what Dr. Neuqs said back in 2010. His essential conclusion was this patient can do a low stress, non-high cognitive functioning job. This precludes her current job, but does not preclude the performance of any type of occupation. Now, Ms. Kennedy's benefits were terminated when her claim was reviewed under an any occupation standard. She had been under that for, what, three years? She initially was under the own occupation standard. The plan changed during the time period that the plan changed. There was a transition of plan administrators. It went from Anthem to Sedgwick. And during this process, they were gathering information. Ultimately, Sedgwick made the determination under the any occupation standard. She did receive benefits during that time period. No, she was getting, what, $225,000? I think it was $14,000 a month, if I recall correctly. And so she did receive benefits during this time period, during the transition of administrators, and before Sedgwick completed their review. But that was about a year and a half, right? It was quite a while. It was. And my only explanation for that delay, Your Honor, is the transition in benefits. Is Sedgwick still the contractor? I believe they are. Despite their reliance on Dr. Schreiber? I believe they are still the contractor. I'm not for certain about that. So during that transitional period, there was no re-review. And eventually, as far as I can tell from the record, there was no formal re-review. When Sedgwick did the re-review, it was in November of 2012. They made the decision to terminate, the initial decision to terminate Ms. Kennedy's benefits, and then she appealed that, and the appeal was denied in April 2013. Now, as it relates to the medical evidence considered at that time, what the EBC considered were three different independent medical exams, from Dr. Osmond, Noyks, who I just spoke of, and Dr. Schreiber. Four independent record reviews from Dr. Dekranian, Dr. Payne, Dr. Gordon, and Dr. Dabby. They considered the Social Security Administration's denial of Ms. Kennedy's claim. What probative value does the Social Security denial have, particularly since Social Security found she could not do her prior job, as Noyks did, and the Social Security standard is obviously quite different from the Lilly standard. Well, this Court has ruled that it is error not to consider a Social Security determination. Right, but what weight could you give it? It's one piece of evidence along with all the other evidence. Part of the Social Security determination reasoning was similar to what the EBC's reasoning was. But under a completely different standard, right? Social Security is any occupation. This is any occupation. Let's see if I can get the right phrasing, but either consistent or commensurate with her education, training, and experience. The standard under the Lilly plan is any occupation consistent with her education, training, and experience. Now, keep in mind, Ms. Kennedy had extensive training. She had training in human resources. When she was working, was there anybody senior to her in human resources? Yes, there was a senior person. Okay. She reported directly to the, what, vice president for human resources? Correct. She had extensive training in human resources, obviously 20 years of experience. She had extensive training in compensation and benefits. She had an engineering degree. So in the typical disability case, you have somebody with limited skills that can no longer do their job. And then the question is, can they do anything else? Of course, that goes back to Judge Hamilton's question about Social Security. You know, when you get down to the fifth level of Social Security, yeah, any job in the economy and stuff, that just isn't even a comparison. So I think if you stayed with everything else in Social Security, just, yeah, you looked at it, and that's about it. It is not noted as a key record in the decision by the Employee Benefits Committee. They primarily cited the independent medical exams. They talked about the evidence from a rheumatology perspective. I think the key issue here is, given all of the medical evidence, was there sufficient evidence for the Employee Benefits Committee and its exercise of discretion to decide that although Ms. Kennedy had limitations, those limitations did not prevent her from doing any job consistent with her education, experience, and training. What's the standard of redo then? It's arbitrary and capricious. And the district judge didn't look at that very carefully, but he said, well, even if it's arbitrary and capricious, she still wins. That is correct. That is what Judge Lawrence said. And in doing so, from our view, he dismissed, he substituted his own judgment, said, well, I wouldn't rely on this. I don't think this is very weighty. Which doctors, Ms. Boshkoff, both examined the plaintiff and were willing to consider the possibility that fibromyalgia could be disabling? Well, I don't think any of the doctors said fibromyalgia is never disabling. They were not explicit on that point. Schreiber comes awfully close, and Payne does, too. Right. Payne, they both want objective indications, which seem to be perfectly understandable in almost every context, but fibromyalgia is a special problem. I would agree that fibromyalgia is a special problem. I think to go back to your first question, then to go to the next question, Dr. Noyks, his exam was very comprehensive. He accepted the diagnosis of fibromyalgia. He, in fact, became her treating physician. And his IME specifically said in 2010 that she was not disabled under the occupation. Did he provide any updated information? And when he provided any updated information, if you look at the additional information that he provided, he still did not say that she was disabled from any occupation. He said that she could not do a high-stress job. She couldn't work full-time. And that he thought she needed a reduced schedule, which is, and that I believe those factors are, it's within the discretion of the employee benefits committee to apply its judgment, consistent with its knowledge of not only the many, many jobs available at Lilly, which is a large employer. Was she offered any of those? Well, it is not in the record, but, yes, she was offered some positions at Lilly. That was one of the gaps that I thought, isn't there someplace in between the whatever, and that was one of them. The other is was there a possibility of a lot less retirement benefit or disability benefit. Once she gets it, it's pretty high. She said she paid the premium for it, but still it's a pretty high benefit. That I don't think was an option. But as it relates to what Dr. Noik said, and keep in mind you've got the record reviews, which are perfectly valid under Seventh Circuit authority, but we also have the IME of Dr. Noik's. We have Dr. Schreiber, which I think the EBC did pretty well. Well, the district judge discussed all these doctors, and what is your criticism of the district judge's analysis? He sort of dismissed them one by one. No, he didn't dismiss them. Well, he discussed them all. He didn't dismiss them summarily. Well, I think my analysis of what the district judge did was he went and looked and critiqued them all. I think this court has ruled previously that doctors are not supposed to write lawyer-like opinions. There was a large amount of medical evidence here, and not one single doctor other than Dr. Condit said that Ms. Kennedy was disabled under the NE Occupation Standard, and even Dr. Condit did not really provide evidence of restrictions that would support this. He filled out a couple of forms, one of which said that she couldn't sit for more than two hours and that she had to change positions. That's not consistent, inconsistent with an NE Occupation Standard. So the district court, I think, went through and dismissed some of these, critiqued some of them. What he said about, what the judge said about Dr. Payne, he criticized him for insistence on objective evidence to demonstrate the symptoms of fibromyalgia. But as Judge Hamilton said, what is unique about fibromyalgia is that these symptoms are very difficult to identify. So what is wrong with the judge's skepticism about Dr. Payne's evidence? That is... No features of musculoskeletal damage. The absence of such features is not inconsistent with fibromyalgia having disabling effects on people's... And I think, Your Honor, that is exactly the issue. These doctors all accepted the diagnosis of fibromyalgia. The issue is what medical restrictions are supported in the record, and this court has clearly held that an employer can look for those types of restrictions. Yes, Dr. Payne made comments about fibromyalgia, but he also noted that there were complaints of pain. Since the exam data are all normal, is that inconsistent with fibromyalgia? That is not inconsistent. Right. But that doesn't... So why is he mentioning it? Because he's a doctor and he's writing down... Yeah, but why is he mentioning irrelevant things in his report? Well, I think that all of these doctors are in the habit of... Well, I think it's all irrelevant, what Payne said, and that's what the judge said. Well, Payne, with all due respect, Your Honor, Payne was not the only physician. We have Dr. Noykes, who did an IME that I don't think is subject to any criticism, and he did not find her disabled from any occupation. Just that it's three years before the decision was made, and you had more recent information. In his update material, he did not find her disabled from any occupation. Ms. Boschkoff, could I, on the standard, again, it's not any occupation, right? I know that's shorthand. But what's the relevance of Ms. Kennedy's report about the phone call she had where someone told her, look, if you can work 20 hours a week as an administrative assistant, then you're not disabled under this. Any occupation consistent with your education, training, and experience. Well, I'm not sure there's any relevance to that other than Ms. Kennedy appears to be claiming at times that she didn't understand what the standard was, and, in fact, that phone call and other statements in her appeal indicate that she was clearly told that the standards of whether she could perform any occupation consistent with her education, training, and experience. Okay. Well, I guess I'm trying to get what that means. She's been working in the highest reaches of a global pharmaceutical company's management. She has paid disability insurance premiums, including the optional extended benefit, and is getting paid benefits of some $14,000 a month. Very different from most disability cases we see. Is it Lilly's position, the committee's position, for example, that if she's able to work at an entry-level HR position, paying, let's say, $50,000 a year, that she is then no longer disabled and must take such a job? I think the answer to that question is in the most information we have about that is in the letter, where it says while the committee determined that, from a rheumatology perspective, you may be precluded from performing your prior human resources executive position, it is also determined that the documentation does not support your inability to perform other occupations consistent with your education, training, and experience. So essentially, Lilly's conclusion, the EBC's conclusion, is that just because you can't be an executive anymore doesn't mean you can't perform a job consistent with your education, training, and experience. And I think this is really an issue that is uniquely interpretive as to what that phrase means. I think the question Your Honor is posing is, well, if somebody is used to being the president of the company and they can't do that anymore, but they can do lots of other things, is that consistent with their training, education, and experience? I think implicit in this letter was the EBC's determination that you're an agency. What, she's going to be a secretary? No. Project work. She had experience in compensation and benefits. She could be on a compensation and benefits team. She could do support work for human resources. Well, have they specified the job they wanted to take? Not in this letter, Your Honor. It has not specified the conclusion. Let me ask you, was this Dr. Noix or whatever, was that the one you mentioned? Yes. Yeah, well, look what the judge said. Look what he said. Said increasing the dosage of her medication caused cognitive impairment while decreasing the notion caused her to be somewhat uncomfortable and at the last visit her function level had declined slightly and her anxiety was significantly worse. That doesn't sound supportive of the company. Well, what Dr. Noix specifically said as to restrictions, which is what I think is the relevant issue here in terms of ability to work, was that in that very latest letter he said that he didn't think that she could work a regular schedule. He said that, but he said other things about her function level declining and her anxiety being significantly worse. Well, that sounds bad. That does sound bad, but that doesn't sound like somebody who's completely unable to work. Are you sure about that? Do you know anything about anxiety? I don't think you do. We also have an IME from a psychiatrist. Increasing the dosage of her medication causes cognitive impairment? That sounds serious. Again, Dr. Noix also said at that time that she was able to work. She's able to work with her cognitive impairment? Right, because even if she can't perform her high-level executive job, there's plenty of work in compensation and benefits and human resources that would allow her to go back to the workforce. They actually said that? She can be cognitively impaired but still hold a job? Dr. Noix has never offered the opinion that she's disabled from any occupation. Yeah, he just keeps contradicting himself. And I think the Employee Benefits Committee was entitled to take all of the information from Dr. Noix into account. Well, so is the judge. Correct, but the judge was required to review the EBC under an abusive discretionary standard. Well, he discusses in detail what these doctors said. Doesn't seem to support the company. That was Judge Lawrence's view. And what I submit to you is that it was the EBC's decision at the outset to weigh all of these different pieces of medical evidence. I think if you look through the record in great detail, you'll find very little, not only objective evidence, but even subjective evidence of real restrictions that would prevent Ms. Kennedy from returning to work under the standard of any occupation. Okay, well, thank you, Ms. Poshkoff. Mr. Dabofsky. Good afternoon. May it please the court, counsel. My name is Mark Dabofsky. I represent the plaintiff, Apollee Kathleen Kennedy. We're asking this court to affirm the judgment of the court below rendered by Judge Lawrence. Judge Lawrence's decision was well-supported, well-reasoned, well-thought-out, and clearly showed that the EBC's decision was arbitrary and capricious. Judge Lawrence's remedy of reinstating benefits was also consistent with this court's holdings in numerous cases, Hackett v. Xerox, Schneider v. Century Group, and so on. The status quo ante prior to the termination of benefits made by the mature file review that the Employee Benefits Committee had accepted in 2011, August 19th, 2011, and approved August 24th, 2011, it's in the record at page 321 of the claim file, indicated that the definition change was approved, that there had been a vocational review, and that benefits were scheduled to continue until 12-31-2025. That was the status quo ante. The only evidence... Did you say 2025? 2025. That's when she'd be eligible for retirement? That's when she would reach the age of 65 and be eligible for full retirement. One of the ironies here is that Ms. Kennedy was forced to draw early retirement, which is an offset against the extended disability leave benefits, which would otherwise have been approximately $15,000 a month. Has the district judge's judgment taken effect yet? Is she getting the restored payments yet? No. Okay, all right. The evidence subsequent to the mature file review indicated that if anything, Ms. Kennedy's condition has worsened. At the time that the decision was made in 2011, and continuing until approximately the time of the appeal, Ms. Kennedy was under the care and treatment of Dr. Condit, a rheumatologist. The records from Dr. Condit, the last reports that he issued were in June of 2012. Dr. Condit's reports indicated that Ms. Kennedy's pain level was at 7.5 out of 10. He added to her medication regime, which consisted of two opioid pain-relieving medications and two benzodiazepines. He added corticosteroid medication. He added Meddrol to her medication regime to try to reduce her pain. Is she still taking opioids? They're dangerous, aren't they? Opioids are dangerous. The record doesn't indicate what her current medication regime is, but those types of medications are recommended for treatment of fibromyalgia or certainly were recommended 2011, 2012, when she was receiving those medications. The statement that Dr. Noyks did not support Ms. Kennedy's total disability is simply erroneous. Even going back to 2010, when Dr. Noyks did the original independent medical examination at Lilly's request, Dr. Noyks found that Ms. Kennedy could not work a regular work schedule. He maintained the same finding in December of 2012. He maintained the same finding in February of 2013. That was the evidence. Judge Lawrence concluded that based on the evidence contained in the claim record, just as in the Hawkins case that this court authored in 2003, all that the plan had were scraps of evidence to support the claim decision. Yeah, but the subsequent case cleared that up some. I mean, that's true. I mean, Judge Boser wrote that. Right. But the thing that I'm worried about, this is the Williams v. Eppner Life Insurance that I'm referring to. Are you familiar with that? I'm very familiar with that case. And the Williams v. Eppner case said that while objective proof of diagnosis is not required, objective proof of functionality may be required. The problem, though, is that the plan never based their decision on a lack of objective evidence. They never cited that provision of the policy. They never said in the initial denial letter, Ms. Kennedy, you need to provide us with objective evidence of functionality, such as a functional capacity evaluation. Well, the thing that concerns me, and maybe it's not a concern, but you mentioned it, the standard is arbitrary and capricious. Correct. And it should be that the fund or whatever we're calling it should have substantial deference. I mean, that's the whole point of having these people, as opposed to judges, making a medical decision. And what concerns me is, with some of the discussion we've had earlier, is a woman of this capacity is not reduced to zero. And I can understand with the pain, but certain objective standards, for instance, a lot of people, a lot of very talented people, now work out of the home. And with the electronic and computers and everything else, I happen to have a half-time clerk that works out of the home. That's mostly because of her handicapped child, and she has to stay there, but she does great work. And that's what bothers me about this case, is there isn't a halfway point. Now, there was some mention that she could have possibly had another job with Lilly. It's a big company and has all kinds of, at every level. Maybe that isn't fair, to have to go work for the same company at a reduced level, and be surrounded by people that used to be her subordinates. I don't know, maybe that's the way of looking at it, as opposed to using her ability. I mean, she's probably still very talented in her present capacity. And that's what bothers me about this case, because you have the arbitrary and capricious standard, which I think the judge said, it doesn't matter, arbitrary and capricious, she still wins. So that's all I'm questioning. I'm not sure where I am with this. But I do look at a very talented woman. She was very highly paid. She's now got this unfortunate disease, which is, you know, the pain is subjective. There's no question about that. You're not going to feel what somebody hurts. The objective standards, which I think at least are important, they should be considered. And to get results to zero and get maximum retirement. Now, maybe she paid a lot of premium to get that, and I can understand it. Anyway, I said enough. Judge Lawrence did respect the arbitrary and capricious standard. And what I think ultimately convinced him was his reading of the records, which showed that Ms. Kennedy could not sustain a regular work schedule. And he cited both a Social Security case and a discrimination case for the proposition that the inability to work a regular work schedule means that you're not going to be a reliable employee, and therefore you could potentially be disabled. That's what he used for his conclusion. Ms. Kennedy has regular pain spikes. From the 2010 IME that Dr. Noyks did, there was an indication that the pain spikes would be unpredictable and that she would be expected to miss at least two days of work each month to recover from those pain spikes. This is a woman who suffers from severe pain on a constant basis, who doesn't sleep well at night, and is severely fatigued on a constant basis. And she wrote something interesting to the committee that the committee never responded to. This is in the supplemental appendix at page 17. She expressed her understanding that the definition of disability under the any occupation standard, consistent with training, education, and experience, has two parts. Can the employee return to work at the same work schedule as prior to becoming ill? And the second part is at the same level of job in the field of expertise slash experience the employer worked prior to becoming ill. That's the correct interpretation of what's meant and what distinguishes the definition of disability in this plan from the Social Security definition of any gainful activity. Well, reduced ability then is a disability. Reduced ability is a disability. And while Lilly determined that Ms. Kennedy could work at another human resources job, what's completely absent is any vocational determination that referenced that. There's a reference in the defendant's briefs to a vocational assessment that was done by a Ms. O'Reilly. But the reference to that page does not indicate a full-blown vocational assessment. It doesn't indicate any capability of working at a particular job. It just suggested that the committee get more evidence, which the committee did. But ultimately, the only reliable evidence, the only substantial evidence from a doctor who's examined Ms. Kennedy, is that she cannot work a regular work schedule on a consistent basis. Dr. Condit had written that she was at a level 5 impairment, incapable of sedentary work activity. So the evidence established that she could not maintain a work schedule and was therefore disabled. And the only real countervailing evidence, because Dr. Schreiber's report not only was discredited and disavowed by Lilly, Lilly didn't even discuss Dr. Schreiber's report in their final claim decision. So the only thing that's left is Dr. Payne. And as the Court has pointed out, Dr. Payne was apparently addressing something besides fibromyalgia but never directly addressed fibromyalgia. I see my time is up, and we ask the Court to affirm. Thank you, Mr. DeBosky. Ms. Boschkoff, would you like another minute? Thank you. One thing that strikes me as I'm listening and pondering the questions that were asked is that we are debating the definition of disability. And I think some of the questions have related to can Ms. Kennedy be essentially forced to take a demotion. That's an interpretation of what that provision means in the plan. Now, the EBC or Lilly could have created a plan such that it says you never have to take a pay cut, you never have to take a demotion, you get to stay in your same job, and if you can't do your same job, then you're disabled. That's not what this plan says. This plan has in any occupation consistent with education, training, and experience. Well, Mr. DeBosky said that the committee didn't consider her actual ability to do any work on a sustained basis. But they did. They considered the medical information. And if we talk about Dr. Noykes, and I've got the letter that you were referring to, Your Honor, in February of 2013, he says she could not do high-stress activities or high cognitive functioning, and he didn't think she could work a regular work schedule. They considered that in light of not only Lilly's obligation, but every employer's obligation to accommodate people with disabilities. So they accepted his evaluation? They considered this evidence along with... Well, you say they considered it. Did they accept it or did they reject it? Because as you summarized his evidence, suggested she couldn't work. I don't know how much weight they placed on it. They did discuss it in the letter, and Dr. Noykes also said in December of 2012, it is my opinion she'll be permanently disabled from this particular job. I think the interpretation of Dr. Noykes was he was saying she couldn't do her former job and she could not work a regular schedule. Well, was the committee told by these doctors or by anyone else, did the doctors tell what jobs she could perform? I don't think anyone singled out a particular job she could perform. Well, that's critical. Well, I believe that the EBC applying the standard and looking at the restrictions and weighing the medical evidence concluded... Well, why do they have the competence to do that? What is this committee composed of? Who are these people? There's doctors on the committee, among other things. They also are Lilly employees who have knowledge of the jobs available at Lilly and the accommodations that an employer like Lilly would make to somebody including this plaintiff or this appellant. Well, have they ever actually picked a job that they think she can do? Well, Your Honor, that's not in the record, but there were some positions that were offered to Ms. Kennedy at Lilly. So I think the answer to that is yes. There's nothing in the record about that? No. The positions that were offered to her were not placed in the administrative record, which is the record that's relevant for this appeal. Well, doesn't that make it very hard to evaluate? It does, and we are not relying on that. What I'm relying on is that this interpretation of the any-occupation standard is really the purview of the Employee Benefits Committee. They looked at the medical evidence and the restrictions and concluded that she could do some work, not her former job, but some work. Is there any understanding, as there is in Social Security Disability, that the work at least has to be full-time? That's not in the definition. The definition is consistent with education, training, and experience. There are some plans that have specific numerical definitions, like you have to be able to make 60% of your former income. That's not in this definition. So the definition is what we have, and applying that, the EBC concluded that she could do some work. And then finally, Your Honor, I... Well, anybody could do some work. That is true, and what they concluded was... Well, that's absurd. You'd never have a disability case. And you're right, I misspoke. What they concluded was that she did not meet the meaning of disability as defined by the plan. Any occupation consistent with education, training, and experience. Based on her training, experience, and qualifications. And if the court does conclude the wrong standard was applied or some other procedural defect, we would maintain that remand to correct the mistake is the proper remedy. Thank you. Okay, well, thank you very much to both counsel.